**Ralph NADER, Natural Resources Defense Council, State of New York, Public Citizen, Mark Beyeler, et al., Petitioners,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent,**

**and**

**Uniroyal Chemical Company, et al., Respondents–Intervenors.**

No. 87–7103.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 14, 1988.

Decided Oct. 14, 1988.

Albert H. Meyerhoff, National Resources Defense Council, San Francisco, Cal., William B. Schultz, Patti Goldman, Public Citizen Litigation Group, Washington, D.C., Robert Abrams, Atty. Gen., Norman Spiegel, Asst. Atty. Gen., New York City, for petitioners.

Beth S. Ginsberg, Environmental Defense Section, U.S. Dept. of Justice, Edward C. Gray, Attorney, U.S. Environmental Protection Agency, Washington, D.C., for respondent.

Kenneth W. Weinstein, McKenna, Conner & Cuneo, Washington, D.C., for respondents-intervenors.

Before CHAMBERS, SCHROEDER and FLETCHER, Circuit Judges.

FLETCHER, Circuit Judge:

This case requires us to decide for the first time whether the EPA's denial of a citizens' rulemaking petition may be directly appealed to this court pursuant to 21 U.S.C. § 346a(i) or 21 U.S.C. § 348(g).

After several disputed scientific studies suggested that the pesticide daminozide may cause tumors, respondent EPA conducted a special review to decide whether to revoke the tolerance for daminozide. On

the basis of its Scientific Advisory Panel's decision that the studies were inconclusive, the Agency decided not to revoke the tolerances. Instead, it proposed in April, 1986, to reduce the tolerance from 30 parts per million to 20 ppm. In July 1986, while EPA's proposed rule was still pending, petitioners filed a petition under 21 U.S.C. §§ 346a and 348 asking the Agency to revoke the tolerance altogether. 21 U.S.C. § 346a(e) provides that the Administrator "may" propose regulations when asked by an interested person to do so, but imposes no express duty on the Administrator. On January 6, 1987, EPA denied the petition. Ten days later, on January 16, it published a final regulation reducing the tolerance for daminozide from 30 ppm to 20 ppm.

Petitioners appeal the denial of their petition. They contend that 21 U.S.C. §§ 346a(i) and 348 grant this court jurisdiction to review EPA's denial. Because petitioners failed to comply with procedural prerequisites for review under § 348(g) and because we find no appealable order for purposes of § 346a(i), we dismiss for want of jurisdiction.

## BACKGROUND

### A. *Statutory Framework*

The Environmental Protection Agency (EPA or Agency) regulates pesticides under two separate statutes—the Federal Food, Drug and Cosmetic Act (FDCA), 21 U.S.C. §§ 301–392, and the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. §§ 136–136y. Before a pesticide may be sold or distributed in the United States, it must be registered by EPA under FIFRA. A pesticide may be registered only if it does not cause "unreasonable adverse effects" on human health or the environment, a standard that is applied by weighing the benefits of a pesticide against its risks. 7 U.S.C. §§ 136a, 136(bb).

Under the FDCA, no residue of a pesticide not generally recognized as safe may be present on a raw agricultural commodity unless the Agency has established a "tolerance" or an exemption from the requirement of a tolerance. 21 U.S.C. § 346a(a). A tolerance is the maximum allowable amount of pesticide that may remain in or on a commodity. Under section 346a(b), the Administrator must issue a regulation establishing a tolerance for the pesticide "to the extent necessary to protect the public health." In establishing a tolerance, the Administrator is to "give appropriate consideration, among other relevant factors, [] to the necessity for the production of an adequate, wholesome, and economical food supply." *Id.* The Administrator may set the tolerance at zero if the available scientific data do not justify the establishment of a greater tolerance. *Id.*

In addition to establishing tolerances for raw products, the Agency may set tolerances for pesticide residues in processed foods. 21 U.S.C. § 348(d).[1] Absent such a tolerance, a processed food bearing residues at levels in excess of that authorized in the raw product is considered "adulterated" and prohibited in interstate commerce. 21 U.S.C. § 342(a)(2)(C). Section 348 also contains a provision known as the "Delaney clause," which dictates that "no additive shall be deemed to be safe if it is found to induce cancer when ingested by man or animal...." 21 U.S.C. § 348(c)(3)(A).

Both section 346a and 348 permit persons outside the EPA to request the Agency to set a tolerance. Section 346a(e) provides:

The Administrator may at any time, upon his own initiative or upon the request of any interested person, propose the issuance of a regulation establishing a tolerance for a pesticide chemical....

If within 30 days of the publication of such a proposal, there has been no request for an advisory committee, the Administrator "may by order publish a regulation based upon the proposal[.]" *Id.*

Similarly, section 348 permits "any person" to file a petition proposing the is-

---

1. Under the Reorganization Plan that established EPA in 1970, the authority to set tolerances for pesticide chemicals under § 348 was transferred from the FDA to the EPA. Reorg. Plan No. 3 of 1970, § 2(a)(4), (a)(8)(i), 40 C.F.R. pt. 1 (1970), *reprinted in* 5 U.S.C.App. at 1132 (1982).

suance of a regulation prescribing, among other things, a tolerance level. 21 U.S.C. § 348(b). Thereafter, the Administrator must, by order, either establish a regulation or deny the petition. 21 U.S.C. § 348(c).

## B. *Administrative Proceedings*

The pesticide at issue in this case is daminozide, a plant growth regulator the principal use of which is on apples. Daminozide is sold by respondent Uniroyal under the trademark name "Alar." First registered in 1963, it was approved for use on apples in 1968. Alar reduces crop losses and lowers harvesting costs by preventing the fruit from dropping off the trees prior to harvest. It also reduces many fruit disorders, increases fruit size, and enhances the firmness of the apples, enabling them to be stored and marketed throughout the year.

Unfortunately, there is also evidence to suggest that daminozide or its degradation product, unsymmetrical dimethylhydrazine (UDMH), may be an animal carcinogen. Five scientific studies conducted between 1973 and 1984 demonstrated with statistically significant results a correlation between ingestion of Alar and various types of tumors in certain lab animals. Both the methodology and the results of these studies have been questioned, however, and the parties in this case disagree as to their significance.

The studies aroused sufficient concern at the EPA that in June 1984 the Agency stated that based on its review of the data, it had "concluded that daminozide and its UDMH hydrolosis product are oncogenic [tumor causing] in laboratory rats and mice." Guidance for the Interim Registration of Pesticide Products Containing Daminozide as the Active Ingredient at 12. UDMH was characterized as "a known animal oncogen." *Id.* at 5.

The next month, the agency initiated a "special review" to determine whether to publish a notice of intent to cancel Alar's registration. 49 Fed.Reg. 29, 126 (July 18, 1984). EPA allowed Uniroyal 45 days to submit evidence, including any published or unpublished studies and analyses, and directed registrants "to notify EPA of any studies currently in progress." *Id.* at 29,-140. Uniroyal provided extensive comments criticizing the validity of the studies of daminozide. Specifically, the company contended that the tests were conducted under unacceptable procedures that rendered the results unreliable, that some of the test animals were diseased, and that daminozide had been administered in amounts in excess of the maximum tolerated dose.

Despite Uniroyal's submissions, the Agency reaffirmed its earlier conclusions in a September 1985 report which found that "the tumor incidences are so consistently overwhelming that the experimental deficiencies were not considered fatal flaws." Review of the Audit Conducted by Uniroyal at 11 (September 11, 1985). Before formally initiating the process of canceling a registration, the Agency must submit all underlying data in support of its proposed action to the Scientific Advisory Panel (SAP). Accordingly, EPA drafted Position Document 2/3/4 (PD 2/3/4) concluding that the cancer risk to adults from Alar residues in foods lay between 1/100 and 1/1000. PD 2/3/4 at II–48. Since infants may be exposed to 10 to 14 times more Alar than adults, the Agency found the cancer risk to babies commensurately greater. *Id.* at II–51. On the basis of these findings, EPA's Position Document announced it was "conducting an expedited cancellation for food uses of daminozide." *Id.*, Executive Summary at 3. The document and the supporting data were submitted to the SAP, and notice of a public SAP meeting was published. 50 Fed.Reg. 35,317 (Aug. 30, 1985).

The SAP held a one-day hearing on September 26, 1985. Uniroyal presented expert testimony that disagreed with EPA's proposed findings, and reiterated many of the positions it had presented to the Agency. It also argued that the test results were equivocal, and that it had commenced new rat and mouse feeding studies of daminozide that would be completed in 1988. The Agency responded by acknowledging

flaws in the studies, but stated that, evaluated cumulatively, the studies supported the decision to cancel the registration.

On October 4, 1985, the SAP issued its written findings. It concluded that while the studies gave rise to some concern, the data were "inadequate to perform a qualitative risk assessment." Such an assessment would have to wait until "adequate data become available." The panel criticized the manner in which the quantitative risk assessments were performed in the draft position documents, stating that it had reservations over the "technical soundness" of the risk assessments. At about the same time, EPA referred its draft position document to the Secretary of Agriculture, as required by 7 U.S.C. § 136d(b). The Department (USDA) responded that EPA had underestimated the benefits of daminozide in its preliminary assessment.

After considering the SAP conclusions, the USDA comments, and the scientists' reports, the Agency announced on January 22, 1986 that it would not at that time issue a notice of intent to cancel the registrations of daminozide and that it would reserve a final decision on the special review until reliable data were obtained. EPA Press Release. EPA required Uniroyal to conduct new studies on the toxicity and metabolism of daminozide and UDMH. No one challenged the Agency's decision not to cancel the registrations.

On April 16, 1986, EPA issued a proposed rule under 21 U.S.C. § 346a(e) to reduce the daminozide tolerance on apples from 30 to 20 parts per million (ppm). 51 Fed.Reg. 12,889 (April 16, 1986). Petitioner Natural Resources Defense Council (NRDC), several other environmental groups, two trade associations and a number of states submitted comments.

On July 1, 1986, while EPA's proposed rule was still pending, several of the petitioners in this case filed a petition with the EPA under 21 U.S.C. §§ 346a and 348 to revoke the tolerance for daminozide. Petition for Establishment of Zero Tolerances. The petition relied on the studies the Agency had analyzed in PD 2/3/4. Uniroyal submitted comments opposing petitioners' request and supporting the proposed tolerance reduction to 20 ppm.

EPA denied the petition on January 6, 1987. It cited its finding that the available data were not adequate to classify daminozide or UDMH as carcinogens. The Agency stated that regulation of pesticides must proceed in a coordinated manner under both FIFRA and the FDCA. It claimed that when the criteria for cancellation under FIFRA are not met and there is a need for further data, FIFRA requires the EPA to afford registrants "sufficient time" to obtain the additional information. 7 U.S.C. § 136a(c)(2)(A), (B). Citing the studies that Uniroyal had agreed to conduct, the EPA said "[u]ntil these studies are received, the Agency cannot reach any definitive conclusions about the long-term risks posed by the use of daminozide. Based on available data, however, the Agency has concluded that any risk posed to consumers during the time period required for data generation is small...."

Ten days later, on January 16, 1987, the Agency published a final rule lowering the tolerance for daminozide residues in apples from 30 ppm to 20 ppm until July 31, 1987. 52 Fed.Reg. 1909 (Jan. 16, 1987). The Agency stressed that the use of an interim apple tolerance would permit it to reassess daminozide in light of new data. No one filed objections or requested a hearing on the rule.[2]

2. Subsequently, on March 3, 1987, EPA issued proposed rules to eliminate tolerances for daminozide residues in foods for which the pesticide was no longer registered under FIFRA. The Agency also proposed to lower the tolerance on raw tomatoes from 40 ppm to 0.5 ppm, the tolerance on concentrated tomatoes from 32 ppm to 3 ppm, and the tolerance on tomato pomace (used in animal feed) from 600 ppm to 10 ppm. 52 Fed.Reg. 6344, 6348 (March 3, 1987). In June of that year, Uniroyal filed a petition under section 346a(d)(1) requesting an extension of the 20 ppm tolerance. EPA responded by publishing a notice that invited public comments, but none were received. 52 Fed. Reg. 23,077 (June 17, 1987). EPA decided on the basis of the studies submitted by Uniroyal that a continuance of the 20 ppm level was needed and would be adequate to protect the public health in the short term.

On March 9, 1987, sixty days after the denial of their petition, petitioners brought suit in this court, seeking review of the denial of their petition for rulemaking.

## JURISDICTION

Both EPA and Uniroyal contend that we lack jurisdiction over this petition. Before turning to an analysis of their arguments, we must resolve some ambiguity as to what precisely is being appealed. The Agency contends that petitioners have appealed both the January 6, 1987 denial of their petition and the final ruling of January 16, 1987 to lower the tolerance to 20 ppm. Brief for Respondent at 20.

This conflicts with what petitioners claim they are appealing. In their reply brief, they expressly disavow that they are "seeking review of an EPA decision establishing a tolerance, ... in fact[,] petitioners seek review of the agency's denial of their Petition to initiate proceedings to revoke a tolerance, as is clear from the petition for review and from the jurisdictional statement in their brief." Reply Brief at 10. Moreover, their claim of timeliness rests on the ground that "EPA denied the petition on January 6, 1987, and petitioners filed this petition for review in this Court on March 9, 1987, which was the final business day of the 60–day period[.]" Brief of Petitioner at 4–5. Petitioners confirmed at oral argument that they seek review only of the denial of their petition. They maintain that we have jurisdiction over the petition denial under both 21 U.S.C. §§ 346a(i) and 348(g). Respondent-intervenor Uniroyal responds that neither section grants this court jurisdiction over discretionary denial of a petition to revoke a tolerance. We review these two provisions in turn.

### 1. Section 348

As noted, 21 U.S.C. § 348(b) permits any person to file a petition proposing regulations for the use of food additives. Under § 348(c), the Administrator must either "by order establish a regulation (whether or not

On July 29, 1987, EPA issued a final rule extending the 20 ppm tolerance through January 31, 1989, at which time Agency experts will

in accord with that proposed by the petitioner)," § 348(c)(1)(A), or "by order deny the petition, and ... notify the petitioner of such order and of the reasons for such action." § 348(c)(1)(B).

Within 30 days after publication of an order pursuant to subsection (c), "any person adversely affected by such an order may file objections thereto with the [Administrator] specifying the reasons for the objections and requesting a public hearing upon such objections." 21 U.S.C. § 348(f)(1). After a hearing, the Administrator must "by order act upon such objections" based upon a fair evaluation of the entire record at the hearing. 21 U.S.C. § 348(f)(2).

Should an "actual controversy" arise "as to the validity of any order issued under subsection (f)," section 348(g) permits direct review of such an order in the court of appeals. To obtain review, any person "who will be adversely affected" must file a petition within 60 days of the order. 21 U.S.C. § 348(g)(1).

Petitioners read subsection (f) as permitting but not requiring aggrieved parties to file objections. This argument is correct as far as it goes—that is, a party adversely affected by an order under subsections (c) or (d) is under no obligation to file objections pursuant to subsection (f). If the party seeks to invoke judicial review under § 348(g), however, objection under § 348(f) is a prerequisite. By its plain terms, section 348(g) permits judicial review in this court only of orders issued under subsection (f). Subsection (f) permits persons adversely affected by the denial of a petition to file objections with the Administrator and seek a hearing. The jurisdiction of the court encompasses orders pertaining to administrative objections, *not* the grant or denial of the petition in the first instance. Had Congress intended to permit direct review of petition denials, it would have conferred jurisdiction over orders issued under subsection (c). Subsection (f) would have been superfluous.

have received and reviewed the additional data earlier requested. 52 Fed.Reg. 28,256.

After their petition was denied, petitioners did not file objections with the Administrator under subsection (f). Since more than 30 days have now elapsed, they cannot allege jurisdiction under section 348(g).

### 2. Section 346a

Petitioners assert an alternative ground for jurisdiction in 21 U.S.C. § 346a(i)(1). They advance the argument that the Agency's denial of their petition constituted an appealable order, but submit virtually no relevant authority to sustain this contention. Indeed, our independent review of the language, context and legislative history of the FDCA leads us to the opposite conclusion.

Section 346a(i)(1) grants the courts of appeals jurisdiction to review "the validity of any order under [§ 346a(e)]." Section 346a(e) provides that upon the request of an interested person, the Administrator "may at any time ... propose the issuance of a regulation establishing a tolerance[.]" By its permissive terms, § 346a(e) plainly accords the Administrator considerable latitude in determining whether to grant a request to propose a tolerance. This discretion contrasts markedly with the provisions of subsections (b), (c) and (d), each of which states that the Administrator "shall" take prescribed action pertaining to promulgating regulations. So deferential is subsection (e) that the Administrator is not only free to deny the requested regulation, she need not even propose it. *See* 40 C.F.R. § 180.29(a) (1987).

Furthermore, the plain wording of § 346a(e) denominates as an "order" only one act of the Administrator: the publishing of a regulation. Unlike § 348(f), it does not characterize the denial of a petition as an "order." As discussed above, subsection (i) authorizes review only of *orders*, not of every act by which a petitioner is aggrieved. Were the Administrator required upon request to propose a regulation, it might plausibly be argued that the denial of a petition for rulemaking in light of new evidence was tantamount to the issuance of a new regulation, and thus an appealable order. Under § 346a(e), however, the only mandatory requirements imposed on the Administrator are not triggered unless the Administrator, in her discretion, first elects to grant a petition for proposing a regulation. If she chooses instead to *deny* a petition, § 346a(e) requires nothing of her.

Our view finds further support in the legislative history. In enacting subsection (i), Congress stated that it provides for appellate court review of orders "*establishing* tolerance or exemption regulations.... Review is available in any case of 'actual controversy' to any person who will be adversely affected by tolerance or exemption regulations[.]" S.Rep. No. 1635, 83d Cong., 2d Sess., *reprinted in* 1954 U.S. Code Cong. & Admin.News 2626, 2635 (emphasis added).

Nor is the denial of a rulemaking petition within the meaning of "order" as that term is defined in the Administrative Procedure Act (APA). The chapter of the APA governing judicial review defines an order as "a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency *in a matter other than rule making* but including licensing." 5 U.S.C. § 551(6), *incorporated in* 5 U.S.C. § 701(b)(2) (emphasis added). As section 346a(e) governs rulemaking, the APA definitions do not apply, and we must look to the statute itself for what Congress intended.

Petitioners claim that *National Coalition Against the Misuse of Pesticides v. Thomas*, 809 F.2d 875 (D.C.Cir.1987), supports a finding of jurisdiction under section 346a(i). *National Coalition* is inapposite, however, because in that case the petitioners were appealing from the issuance of a regulation, not from the denial of a petition to initiate rulemaking. On February 14, 1986, the EPA published a final regulation in the Federal Register setting a tolerance level for ethylene dibromide. *Id.* at 878. The same day, petitioners filed for review in the D.C. Circuit under section 346a(i). *National Coalition* held that they could proceed directly to judicial review under subsection (i) without first pursuing the

permissive administrative review of subsection (d)(5). *Id.* at 879.

The court found it had jurisdiction because the action appealed from—the promulgation of a regulation—was a reviewable order under the express terms of the statute. The court observed that since "the applicable statutory provisions [21 U.S.C. §§ 346a(e), (i) ] by their terms permit review of such orders, conducting review at this stage does not appear to thwart Congressional purposes by encouraging 'deliberate flouting of administrative processes,' a primary concern underlying the exhaustion doctrine." *Id.*

The absence of a final regulation distinguishes the case before us from *National Coalition.* Here, though they could have, petitioners elected not to object to or to appeal from the issuance of the final regulation. Indeed, their petition was both filed and denied while the proposed regulation on daminozide tolerances remained open for comment. On these facts, not only does *National Coalition* fail to reinforce their argument; it affirmatively undermines it.

Were we to review the petition's denial, we would encourage the "deliberate flouting" against which *National Coalition* warned. Congress's "primary purpose" in enacting the provisions at issue was "to assure greater protection of the public health by improving, simplifying, and speeding up the procedure ... for regulating the amount of residue which may remain" on commodities. S.Rep. No. 1635, *reprinted in* 1954 U.S.Code Cong. & Admin.News at 2627. Granting review of a denial under § 346a(e) would advance none of these goals, least of all simplicity. If parties were free simply to file petitions, await their denial, and then be assured of jurisdiction in the court of appeals, there would be little incentive to comply with the procedural provisions of the FDCA that require direct appeals from a regulation to be made within the statutory time period. EPA could conceivably be forced to appear

continually in appellate courts defending regulations long established that parties failed to contest at the time of their promulgation. If Congress had intended such a result, it is unlikely it would have prescribed a fixed deadline for appeals from regulations.

Petitioners' failure to pursue any of the avenues by which they *could* ultimately have obtained judicial review is perplexing, particularly in light of the fact that a regulation governing precisely the issue of concern to them was adopted only ten days after their petition was denied and *before* they filed this appeal. The regulation lowering the daminozide tolerance to 20 ppm took effect on January 16, 1987. Under § 346a(d)(5), petitioners had 30 days from that date to file objections to the new regulations. Such objections, if supported by "reasonable grounds," would have triggered a host of procedures, including a public hearing at which petitioners could have made their evidence part of the record. *See* 40 C.F.R. § 180.13 (1987). After hearing and considering their objections and evidence, the Administrator would have promulgated a final regulation, reviewable in this court under § 346a(i)(1).

Petitioners also could have filed objections to their own petition's denial for 30 days following its denial pursuant to § 348(f). A timely filed objection under that section, as under § 346a(d)(5), obligates the Administrator to hold a hearing and issue an order based on the record made at the hearing. Had petitioners exercised this option and still been dissatisfied with the outcome, they could then have sought review in this court under the provisions of § 348(g)(1).[3]

Congress did not condition our jurisdiction over petition denials on compliance with the FDCA's procedures merely as a matter of empty formalism. Rather, section 348(f) performs the critical function of ensuring that a factual record is made before the Agency and reviewed by the Agency before resort to the court of appeals.

---

**3.** Alternatively, petitioners could have avoided further Agency proceedings by simply appealing from the January 16, 1987 regulation in a timely

fashion. Under *National Coalition* and the clear terms of § 346a(e), the promulgation of a regulation is a reviewable order.

By ignoring the statute's prescribed procedures and appealing directly to this court, petitioners bypassed the important intermediate step of objecting and requesting a hearing before the Agency. Were we to attempt to analyze the record in light of petitioners' concerns, we would in essence have to perform work the Agency, with its expertise, is far better qualified to do. The purpose of provisions such as § 348(f) is to bring the Agency's experience to bear on a contested question in the framework of a hearing, where contrasting views can be heard and evaluated by the Agency. While it is true that the Administrator considered petitioners' evidence before denying their request, the lack of a hearing and fully developed record deprives this court of the full benefit of the Agency's expertise.

We are aware that under other statutes, a decision not to pursue proposed rulemaking has been held judicially reviewable. *See, e.g., Natural Resources Defense Council v. Securities and Exchange Com'n,* 606 F.2d 1031 (D.C.Cir.1979); *NRDC v. Nuclear Regulatory Com'n,* 666 F.2d 595 (D.C.Cir.1981) (under Hobbs Act, 28 U.S.C. § 2342, court of appeals may review denial of rulemaking petition which challenges regulations on ground of substantive invalidity). None of these cases, however, involved the FDCA. Nor did the statutes that were at issue employ analogous language in respect to their grants of jurisdiction to that contained in the FDCA. The provision at issue in *NRDC v. NRC,* for example, defines as reviewable any order in *"any* proceeding for the issuance *or modification* of rules and regulations dealing with the activities of [NRC] licensees." 42 U.S.C. § 2239 (emphasis added). This broad language embraces a far more extensive range of reviewable actions than the limited grant of jurisdiction under 21 U.S.C. § 346a(i) to review orders under subsections (d)(5), (e) and (1). As the D.C. Circuit has noted, the FDCA

contains no single, overarching provision governing judicial review. Instead, discrete agency actions are subject to specialized review provisions. See, e.g., ... § 371(f) (review by court of appeals of orders issued pursuant to provisions enumerated in § 371(e)).[4] Agency actions taken under sections silent in this respect are directly reviewable in a district court under some appropriate head of its jurisdiction, for courts of appeals have only such jurisdiction as Congress has chosen to confer upon them.

*Cutler v. Hayes,* 818 F.2d 879, 887 n. 61 (D.C.Cir.1987). Since jurisdiction in the case before us is predicated on a statute significantly more restrictive than those under which the denial of rulemaking has been found reviewable, we find those cases of little utility.

For the same reason, petitioners' reliance on *Florida Power and Light Co. v. Lorion,* 470 U.S. 729, 105 S.Ct. 1598, 84 L.Ed. 2d 643 (1985), is misplaced. Petitioners read *Florida Power* as a general affirmation that any agency's denial of a petition is a reviewable order. Yet in that case the Court faced the question of whether the denial of a petition could be reviewed directly in the court of appeals under 42 U.S.C. § 2239(b) and the Hobbs Act—the same statutes that were at issue in *NRDC v. NRC.* Its holding depended on its lengthy exegesis of those specific statutes; nowhere did the Court intimate that it was ruling as a matter of general administrative procedure. Since jurisdiction in these cases is wholly a creature of statute, we are not at liberty simply to apply the Court's reading of one statute to a separate, dissimilar statute.

In the FDCA, Congress constructed an elaborate yet consistent administrative design for the proposal, consideration, promulgation and review of regulations. The Act provides a number of well-defined avenues for participation by members of the public and review by appellate courts.

---

**4.** 21 U.S.C. § 371(f) states: "In a case of actual controversy as to the validity of any order under subsection (e) of this section, any person who will be adversely affected by such order [may] file a petition with the United States court of appeals ... for a judicial review of such order." This language closely tracks that of section 346a(i), although section 371(e) imposes affirmative duties on the Administrator, whereas section 346a(e) does not.

These provisions permit the maximum citizen input consistent with the Agency's need for consistency and finality. Section 346a(e) states only that the Administrator may propose the issuance of a regulation upon the request of an interested person. She is not required to publish the proposal, hold a hearing, or publish her reasons should she elect to deny a petition. Short of language expressly precluding any review, Congress could hardly have drafted a provision more deferential to the Administrator.

The statutory goals would not be advanced by appellate court review of the petition in this case. Petitioners filed their petition while a proposed regulation on its very subject matter was open for comment. When their petition was denied and the Agency's regulation adopted, they chose not to object to the new regulation or to the denial of their petition, nor to appeal from the regulation. Under petitioners' approach, an aggrieved party, at any time, could file a petition requesting rule-making, await its denial, and then obtain automatic review in the court of appeals. Nothing could be less conducive to finality.

We dismiss for lack of jurisdiction.

DISMISSED.