Patrick W. SIMMONS, Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Association of American
Railroads, Intervenor.

No. 82-1503.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 23, 1985.

Decided March 19, 1985.

Gordon P. MacDougall, Washington, D.C., for petitioner.

H. Glenn Scammel, Atty. I.C.C., Washington, D.C., with whom John Broadley, General Counsel, Ellen D. Hanson, Associate General Counsel, Interstate Commerce Commission, John J. Powers, III and Margaret G. Halpern, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents. Robert B. Nicholson and

Kenneth P. Kolson, Attys., Dept. of Justice, Washington, D.C., entered appearances for respondent Dept. of Justice.

Hollis G. Duensing, Washington, D.C., entered an appearance for intervenor Association of American Railroads.

Before WRIGHT, MIKVA and SCALIA, Circuit Judges.

Opinion for the Court filed by Circuit Judge SCALIA.

SCALIA, Circuit Judge:

This petition presents a challenge to the Interstate Commerce Commission's decision to eliminate from the annual reports required to be filed by railroads certain schedules that do not, in the Commission's judgment, contain any information "needed by the Commission on a regular and frequent basis." The basis of challenge is that the Commission took no account of the fact that the deleted information was of use to the general public.

49 U.S.C. § 11145 (1982) provides that "[t]he Interstate Commerce Commission may require ... carriers ... to file annual, periodic, and special reports," and that "[a]n annual report shall contain an account, in as much detail as the Commission may require, of the affairs of the carrier...." In September 1981 the ICC issued a Notice of Proposed Rulemaking in which it announced its intention of eliminating some of the schedules railroads had been required to file as part of their annual reports. 46 Fed.Reg. 45,966 (1981). The specific nature of the proposed deletions is irrelevant to our decision, but in order to place this dispute in its real-world context we note that one of the schedules whose retention opponents most vigorously urged was Schedule 900, entitled *"Management Compensation: Railroads."* Comments received from the railroads predictably favored the proposed changes; comments of opponents, who included petitioner, the Illinois Legislative Director of the United Transportation Union, stressed the usefulness of the information to the public. The Commission adopted the proposed rule with

minor modifications on February 25, 1982. Revision to Railroad Annual Report Form R–1, 365 I.C.C. 552 (1982) ("Final Rule"). Petitioner filed a petition for review in this court under 28 U.S.C. § 2342 (1982).

Petitioner challenges the ICC's decision both as contrary to law and as arbitrary, capricious and an abuse of the agency's discretion. *See* 5 U.S.C. § 706(2)(A) (1982). With regard to the former, petitioner contends that the ICC is not free under the Interstate Commerce Act to confine annual reporting requirements to information it needs for its own regulatory purposes but must consider the public's informational needs as well. There is concededly no basis for this contention in the text of the statute, which has never even specifically required that information filed under its provisions be made public, much less that the nature of the information demanded be determined on the basis of usefulness to the general public. *See Association of American Railroads v. United States,* 371 F.Supp. 114, 116 (D.D.C.1974) (three-judge court) (dictum). In this regard, the Interstate Commerce Act differs from such "public disclosure" statutes as, for example, the Securities Act of 1933 and the Trust Indenture Act of 1939, which specifically provide that the information required to be filed "shall be made available to the public," 15 U.S.C. §§ 77f(d), 77ggg(a) (1982). Of course public disclosure of information acquired under all statutes is now generally required by the Freedom of Information Act, 5 U.S.C. § 552 (1982), but the presence or absence of specific provision for public disclosure in the text of the substantive statute continues to have a bearing upon whether a basic purpose of the statute, which the agency must implement, is to obtain information for use of the public.

Petitioner points to various statements made by the ICC and by the courts that recognize the usefulness to the public of information compiled by the ICC. For example, the following:

One of the prime purposes of § 20 [of the Interstate Commerce Act] is and has

been since the adoption of the Act of 1887, that the carrier's accounts should be uniform, so as to afford the Commission *and the public* a basis for comparison of their respective operations.

*Norfolk & Western Ry. v. United States,* 287 U.S. 134, 140, 53 S.Ct. 52, 54, 77 L.Ed. 218 (1932) (emphasis added).

The framers of the act of 1887 foresaw that minute annual reports would not only be of great aid to the Commission in the performance of its duties, *but also that they would be of great interest to the public generally.*

*Seventh Annual ICC Report* 71 (1893) (emphasis added).

The delay of the carriers in filing reports *deprives the public* of a large share of the benefit which might otherwise be secured from the statistical work of the Commission....

*Ninth Annual ICC Report* 58 (1895) (emphasis added). What these and other statements alluded to by petitioner necessarily establish is simply—what no one contests— that the information required by the Commission for its own administrative purposes is useful to the public. They do *not* establish as the Commission's view (and we need not resolve whether such a view would be valid) that usefulness to the public is alone sufficient justification for requiring information.

■ Petitioner further contends, however, that the ICC's basis for changing the rules was arbitrary, capricious and an abuse of discretion. There is a dispute at the outset concerning what the asserted basis was. Counsel for the Commission would have us believe that the ICC merely determined that particular items of information once thought by the Commission to be useful—including within that concept usefulness to the public—are no longer useful. They assert that "[t]he agency fully considered, but found unpersuasive, the perfunctory comments offered in support of" public need for the information, Brief for Respondent at 13, and "concluded that

there was not a sufficient public need for the data to warrant a regulatory requirement for it," *id.* at 10. This interpretation is not supportable. While the agency's statement of basis and purpose for the rule displayed an *awareness* of the contentions regarding public usefulness of the information (they were summarized at 365 I.C.C. at 553) the *response* to those contentions was not that they were ill founded or inadequate, but consisted entirely of the following:

The Commission's Policy Statement on Financial and Statistical Reporting (44 F.R. 27537), served May 7, 1979, limits reporting requirements to items essential to Commission needs. Specifically, periodical reports shall be required only for information needed by the Commission on a regular and frequent basis. Further, the Staggers Rail Act of 1980 (49 U.S.C. 11166) generally limits Commission reports to information considered necessary for cost accounting objectives or compliance with generally accepted accounting principles.

. . . .

We recognize that State regulatory agencies, consultants and unions may desire certain information contained in these schedules. However, the Commission must weigh outside party desires for information against Commission needs. Whenever it is clearly evident that periodically filed carrier information is not used by the Commission regularly and frequently, the Commission shall adjust the reporting requirements accordingly.

365 I.C.C. at 553–54. The statement that the Commission "must weigh outside party desires for information against Commission needs," *id.* at 554, cannot possibly mean weighing the public usefulness of particular information requirements in the context of each rulemaking, including the one conducted here. That would be incompatible not only with the justification expressed in the earlier paragraph, but also with the immediately following statement that

"*[w]henever* it is clearly evident that periodically filed carrier information is not used by the Commission regularly and frequently, the Commission shall adjust the reporting requirements accordingly," *id.* (emphasis added). The "weighing" of public usefulness referred to can only be the assessment of the importance of that factor which the Commission made *in arriving at its general rule that public usefulness cannot make up for the absence of regular and frequent use by the Commission.* The phraseology is inelegant (if not the thought muddled), but no other meaning can be assigned.

We agree with petitioner, therefore, that the basis for the agency's action in eliminating the previously required schedules was its determination that only information regularly and frequently used by the Commission will be required. Petitioner does not contend that the information at issue here meets that test; or that the test irrationally conflicts with other existing Commission policies; or is an attempt to implement a policy that is none of the Commission's business. The last could hardly be asserted, since the Interstate Commerce Act specifies that it is part of the national transportation policy to "ensure the availability of accurate cost information in [railroad] regulatory proceedings, while *minimizing the burden on rail carriers of developing and maintaining the capability of providing such information.*" 49 U.S.C. § 10101a(14) (emphasis added). (While this policy refers only to cost information, it surely suggests a more general concern with reducing regulatory burdens attendant upon information-reporting requirements.) The Commission's test also furthers a more general federal policy, expressed in the Paperwork Reduction Act of 1980, "to minimize the Federal paperwork burden for individuals, small businesses, State and local governments, and other persons," 44 U.S.C. § 3501(1) (1982).

We are left, in other words, with no basis for reversing the substance of the Commission's action except the contention that—though the test it has applied is not contrary to statutory command, incompatible with other Commission policies, or directed at goals beyond the Commission's jurisdiction; and though the test properly excludes the particular schedules at issue here—it is unreasonable for the Commission to use so stringent a test, instead of one that takes into account the public's need for information. At least at that point, if not much earlier, we have entered an area of judgment well within the agency's assigned discretion. Congress has specified that annual reports shall contain an account of carriers' affairs not in a degree of detail prescribed by even any general statutory term, but rather in "as much detail as the Commission may require," 49 U.S.C. § 11145(b)(1). That prescription leaves it to the Commission, and not to us, to determine which of the various policies that the annual report requirement might serve (but need not serve) should be pursued.

■ Besides the substantive challenges, however, petitioner also mounts a procedural challenge, which we do find meritorious. While the decision to require only such information as is "needed by the Commission on a regular and frequent basis" has adequate legal support, that decision appears not to have been arrived at *in this rulemaking proceeding.* Rather, the relevant portion of the Commission's statement of basis and purpose (set forth above) appeals to the authoritative effect of the previously adopted Policy Statement on Financial and Statistical Reporting. 44 Fed.Reg. 27,537 (1979).[1] The problem with this is

---

**1.** The subsequent reference to the Staggers Act cost-accounting provision, 49 U.S.C. § 11166, as a "[f]urther" basis for the decision cannot have been meant as an independent ground—or if so was ineffective for that end. The annual reports that the Commission is authorized to require under 49 U.S.C. § 11145 may require information much beyond data to which cost-accounting principles would be applicable—for example, the management compensation information required by the deleted Schedule 900.

that[1] the Policy Statement was neither a principle adopted in the course of a binding adjudication, *see NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 290–94, 94 S.Ct. 1757, 1769–71, 40 L.Ed.2d 134 (1974); *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 765–66, 89 S.Ct. 1426, 1429–30, 22 L.Ed.2d 709 (1969), nor a rule promulgated in accordance with the notice-and-comment rulemaking procedures of 5 U.S.C. § 553 (1982). It was not, therefore, binding agency precedent and could not be treated as such.[2]

■ When an agency promulgates a policy without the formalities required to make it a valid rule, it must, in subsequent rulemakings as in subsequent adjudications, "be prepared to support the policy just as if the policy statement had never been issued." *Pacific Gas & Electric Co. v. FPC*, 506 F.2d 33, 38 (D.C.Cir.1974) (footnote omitted). *See also Guardian Federal Savings and Loan Ass'n v. Federal Savings & Loan Insurance Corp.*, 589 F.2d 658, 666 (D.C.Cir.1978). This requirement is far from an empty gesture. The APA establishes procedural requirements for rulemaking precisely because they are presumed to elicit responses which, when given the requisite consideration by the agency, may affect its decision. Here the opportunity for such an effect has never been accorded. At the time the original Policy Statement was decided upon, public comments were not properly invited and received; at the time public comments were properly invited and received, they were treated as irrelevant because the matter had already been decided. This is not the process that the law requires.

In fact, in the present case it goes too far to say that public comments were *ever* properly invited and received. While the Notice of Proposed Rulemaking advised petitioner and others that the Commission proposed to eliminate the relevant schedules, it did not suggest that that was being done as part of a more general policy of limiting periodic reports to information regularly used by the Commission. As far as appears, the opposing commenters had no inkling that this was the basic issue on the table. This violated the requirement that the notice of proposed rulemaking be "sufficiently descriptive of the 'subjects and issues involved' so that interested parties may offer informed criticism and comments." *Ethyl Corp. v. EPA*, 541 F.2d 1, 48 (D.C.Cir.1976). Petitioner and others have not, in other words, been accorded the statutorily required opportunity to tell the Commission why the "regular and frequent use" principle is in their view a bad idea.

We therefore remand this matter to the Commission in order that it may receive and consider comments concerning the "regular and frequent use" policy, and then decide this rulemaking on the basis of its *de novo* adoption or rejection of that policy. Because of the peculiarities of this petition and the Commission's proceedings on this matter, we do not immediately set the rule aside, but permit it to remain in effect for ninety days, subject to whatever action the Commission may take within that time.

*So ordered.*

---

**2.** The Commission also failed to codify the Policy Statement in the Code of Federal Regulations, as is required for all documents of an agency "having general applicability and legal effect ... and ... relied upon by the agency as authority," 44 U.S.C. § 1510 (1982). *See* 1 C.F.R. § 21.1 (1984).