Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports.  Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 6, 2006        Decided April 7, 2006

No. 05-1240

CHAMBER OF COMMERCE
OF THE
UNITED STATES OF AMERICA,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

———

On Petition for Review of an Order of the
Securities and Exchange Commission

———

*Eugene Scalia* argued the cause for petitioner.  With him on the briefs were *John F. Olson, Douglas R. Cox, Cory J. Skolnick, Stephen A. Bokat, Robin S. Conrad*, and *Amar D. Sarwal*.

*Giovanni P. Prezioso*, General Counsel, Securities & Exchange Commission, argued the cause for respondent.  With him on the brief were *Jacob H. Stillman*, Solicitor, *John W.*

*Avery*, Special Counsel, and *Michael L. Post,* Senior Counsel.

*Mercer Bullard* was on the brief for *amici curiae* Fund Democracy, Inc. and Consumer Federal of America in support of respondent.

Before: HENDERSON, ROGERS and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: This appeal concerns the continuing challenge by the Chamber of Commerce of the United States to the rule promulgated on July 27, 2004 ("the Rule") by the Securities and Exchange Commission amending the Exemptive Rules under the Investment Company Act of 1940 ("ICA"), 15 U.S.C. § 80a-1 *et seq*. (2000). The Rule requires that mutual funds relying on the Exemptive Rules adopt certain governance practices, including those set forth in two conditions: a fund must have (1) a board with no less than 75% independent directors and (2) an independent chair. *See* Investment Company Governance, Release No. 26,520, 69 Fed. Reg. 46,378, 46,381 (Aug. 2, 2004) ("Adopting Release"). In *Chamber of Commerce v. SEC*, 412 F.3d 133 (D.C. Cir. 2005) ("*Chamber I*"), the court held that the Chamber had standing to challenge the Rule, the Commission had authority to promulgate the Rule, and the Commission had not violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*., except when it failed, as required by the ICA, to determine the costs of the two conditions and when it failed to address a proposed alternative to the independent chair condition. The court remanded the case to the Commission.

The Chamber now challenges the Commission's decision not to modify the two conditions in response to *Chamber I*. *See* Investment Company Governance, Release No. 26,985, 70 Fed.

Reg. 39,390, 39,398 (July 7, 2005) ("Response Release"). We again hold that the Chamber has standing, and we hold that the Commission had authority to consider whether to modify the Rule prior to issuance of the mandate in *Chamber I*. We further hold that, although the Commission was not constrained by *Chamber I* in how to estimate the costs of the conditions, the Commission failed to comply with section 553(c) of the APA, 5 U.S.C. § 553(c), by relying on materials not in the rulemaking record without affording an opportunity for public comment, to the prejudice of the Chamber. On August 10, 2005, the court stayed the two conditions.

**I.**

Section 2(c) of the ICA requires that when the Commission "engage[s] in rulemaking and is required to consider or determine whether an action is consistent with the public interest, [it] shall . . . consider . . . whether the action will promote efficiency, competition, and capital formation." 15 U.S.C. §80a-2(c). In *Chamber I*, the court held:

> With respect to the 75% independent director condition, the Commission, although describing three methods by which a fund might comply with the condition, claimed it was without a "reliable basis for determining how funds would choose to satisfy the [condition] and therefore it [was] difficult to determine the costs associated with electing independent directors." 69 Fed. Reg. at 46,387. That particular difficulty may mean the Commission can determine only the range within which a fund's cost of compliance will fall, depending upon how it responds to the conditions but, as the Chamber contends, it does not excuse the Commission from its statutory obligation to determine as best it can the economic

implications of the rule it has proposed.

412 F.3d at 143 (citing *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1221 (D.C. Cir. 2004)). With respect to the independent chair condition, the court noted that the Commission had stated that an independent chair may decide to hire more staff, but that it had no "reliable basis for estimating . . . th[ose] costs." *Id.* at 144 (citing Adopting Release, 69 Fed. Reg. at 46,387 n.81) The court held that "[a]lthough the Commission may not have been able to estimate the aggregate cost to the mutual fund industry of additional staff . . . it readily could have estimated the cost to an individual fund, which estimate would be pertinent to its assessment of the effect the condition would have upon efficiency and competition, if not upon capital formation." *Id*. The court also held that the Commission could not ignore a "facially reasonable" alternative suggested by the two dissenting Members of the Commission. *See id.* at 145 (citing standard set forth in *Laclede Gas Co. v. FERC*, 873 F.2d 1494, 1498 (D.C. Cir. 1989)).

The Commission responded within a matter of days to the release of *Chamber I*. The Commission explained that prompt action was required to avoid postponing the January 15, 2006 date for compliance with the Rule in order to ensure protection of fund investors "in the wake of the discovery of serious wrongdoing at many of the nation's largest fund complexes and by officials at the highest levels of those complexes." Response Release, 70 Fed. Reg. at 39,391. This occurred, the Commission explained, because "[f]und managers acted in their own interests rather than in the interests of fund investors (which they are required to do), resulting in substantial investor losses that were well documented at the time [the Commission] adopted the [Rule]," and left investor confidence severely shaken, *id.*; *see* Adopting Release, 69 Fed. Reg. at 43,378. In the Commission's view, prompt action could best be accomplished by having the

same five Commissioners who had been considering mutual fund governance issues for more than a year and a half "bring the[ir] collective judgment and learning" to the issues identified by the court. *See* Response Release, 70 Fed. Reg. at 39,391. Because the Chairman was scheduled to resign on June 30, 2005, the Commission decided to respond to *Chamber I* at its previously scheduled public meeting on June 29, 2005. *See id.* at 39,391; *see also id.* at 39,403 (Glassman, Comm'r, dissenting); *id*. at 39,408 (Atkins, Comm'r, dissenting)..

The Commission decided it was unnecessary to reopen the rulemaking record for further comment. Observing that it had previously given notice and called for comment on the costs of complying with the two conditions, the Commission concluded that "the information in the existing record, *together with publicly available information on which we may rely*, is a sufficient base on which to rest the Commission's consideration of the deficiencies identified by the Court." *Id.* at 39,390-91 (emphasis added). Based on materials not in the rulemaking record, including what the Commission described as a "widely used industry survey" of mutual fund directors' compensation, the Commission determined a range of costs for each of the options that a fund might use to meet the 75% independent director condition. *See id.* at 39,392 n.28, 39,391-94. The Commission viewed the costs to an individual fund of the independent chair condition to derive principally from the increased compensation for the independent chair and the costs of additional staff, the latter cost estimated based on extra-record salary surveys by the Securities Industry Association, a source on which the Commission stated it "commonly rel[ies] in its rulemakings." *Id.* at 39,394. The Commission stated that it did not expect small funds would hire additional staff. *See id.*

The Commission concluded, based on these cost estimates, that the costs of complying with the two conditions "are

extremely small relative to the fund assets for which fund boards are responsible, and are also small relative to the expected benefits of the two conditions." *Id.* at 39,395. "Whether the two conditions are viewed separately or together," the Commission stated, "even at the high end of the ranges, the costs of compliance are minimal." *Id.* This was true as well for small funds. *See id.* at 39,396 n.77. Accordingly, regarding section 2(c) of the ICA, the Commission concluded: "[W]e do not expect the amendments to the Exemptive Rules to have a significant adverse effect on efficiency, competition or capital formation because the costs associated with the amendments are minimal and many funds have already adopted the required practices." *Id.* at 39,396. The Commission noted that as of the time it proposed the Rule, it estimated that "nearly sixty percent of all funds currently me[t] [the 75% independent director] requirement." Adopting Release, 69 Fed. Reg. at 46,387 n.78; *see* Response Release, 70 Fed. Reg. at 39,391 & n.18.

The Commission also set forth its reasons for rejecting the alternative proposal to the independent chair condition: "[I]n light of the nature of investment companies and the purposes of the statutory prohibitions to which the Exemptive Rules apply," the Commission concluded that the condition requiring an independent chair was superior to an expansion of disclosure requirements. *See* Response Release, 70 Fed. Reg. at 39,396-97. The Commission explained that mutual funds are "unique" because they are managed "by people whose primary loyalty and pecuniary interests lie outside the enterprise," which presents "inherent conflicts of interest and potential for abuses." *Id.* at 39,396. The Commission reasoned that disclosure alone would not prevent self-dealing by managers. *See id.* at 39,397. Further, the Commission observed, the independent chair was part of a package of regulatory reforms designed to change the "boardroom culture," *id.*, that would result in benefits that could not be accomplished by disclosure alone, which to become

meaningful faced several obstacles given the information that would need to be imparted to an investor, *see id.*

**II.**

The Chamber petitions for review, challenging the Commission's decision not to modify the Rule's two conditions on procedural and substantive grounds. Before reaching the merits of the Chamber's challenge, we address the Chamber's standing and the Commission's authority to consider whether to modify the two conditions before issuance of the mandate in *Chamber I.*

**A.**

The Commission maintains that the court lacks jurisdiction to consider the Chamber's petition because the Chamber lacks standing under Article III of the Constitution. Specifically, the Commission maintains that the Chamber has failed to show a continuing injury-in-fact and to address the implications of *DH2, Inc. v. SEC*, 422 F.3d 591 (7th Cir. 2005), which the Commission presents as being in conflict with our holding in *Chamber I* that the Chamber has standing. *See Chamber I*, 412 F.3d at 138. Whatever may be said of the injury-in-fact analysis in *DH2*, the holding in *Chamber I* is the law of this circuit. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc).

In *Chamber I*, the court held that the Chamber had standing in light of sworn declarations regarding its investment in, and continuing desire to invest in, mutual funds that are not governed in accordance with the Rule's two conditions. *See Chamber I*, 412 F.3d at 138. The court concluded these concrete actions and intentions were sufficient because the "inability of consumers to buy a desired product constituted injury-in-fact

even if they could ameliorate the injury by purchasing some alternative product." *Id.* (quoting *Consumer Fed'n of Am. v. FCC*, 348 F.3d 1009, 1012 (D.C. Cir. 2003)) (alterations and internal quotations omitted).

The Chamber seeks in its current petition for review to challenge the same two conditions it challenged in *Chamber I*. It has substantiated its claim of continued injury through the September 19, 2005 sworn declaration of Stan M. Harrell, Senior Vice President, Chief Financial Officer and Chief Information Officer of the Chamber. *See Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002). Mr. Harrell avers that the Chamber continues to hold investments in mutual funds, four of which he identifies by name, and currently intends to continue making such investments and wishes to invest in management-chaired funds and in funds with fewer than 75% independent directors. In light of the historical data in the rulemaking record indicating that management-chaired funds may have performed marginally better then independently chaired funds, *see* Adopting Release, 69 Fed. Reg. at 46,383 n.52, and the Chamber's concern that the costs of implementing the two conditions will present barriers to entry, especially for small funds, there is no basis to conclude that the circumstances underlying *Chamber I*'s holding that the Chamber had standing have changed.

**B.**

The Chamber, in turn, challenges the Commission's authority to consider modifying the Rule prior to issuance of the court's mandate in *Chamber I*. It advances this challenge based on an analogy to Federal Rule of Appellate Procedure 41, which effects a limit on the jurisdiction of a district court while a case is pending on appeal, and like Article III standing, might be viewed as a threshold jurisdictional issue. However, the

Chamber's challenge is, in effect, a merits challenge based on section 706(2)(C) of the APA.

Essentially, the Chamber makes a policy argument by analogy. It points to Rule 41, which addresses when the mandate of a court of appeals issues, and to authorities holding that the pendency of an appeal "'divests the district court of control over those aspects of the case involved in the appeal,'" *United States v. DeFries*, 129 F.3d 1293, 1302 (D.C. Cir. 1997) (quoting *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) (per curiam)); *see also* FED. R. APP. P. 3, to argue that the district court does not regain jurisdiction over those issues until the court of appeals issues its mandate, *cf. In re Thorpe*, 655 F.2d 997, 998 (9th Cir. 1981). To extend this principle to agencies, the Chamber points to an isolated and irrelevant reference in the 1998 Advisory Committee Notes addressing when a court of appeals determination becomes a "fixed" legal obligation for an agency. *See* FED. R. APP. P. 41 Advisory Committee's Notes (1998 amends., subdiv. (c)). The Chamber then contends that treating district courts and administrative agencies as "divested" of jurisdiction prior to issuance of the court's mandate "is sensible in light of the[ir] comparable role[s] . . . in developing a factual record and narrowing the issues for review." Petitioner's Br. at 32. Such an approach, the Chamber contends, also is consistent with the rule that a court will not entertain a petition for review while a petition for reconsideration is before an agency. *Id.* (citing *United Transp. Union v. ICC*, 871 F.2d 1114, 1117 (D.C. Cir. 1989)).

The Chamber's contention is unpersuasive. Admittedly, some of the reasons underlying the general principle, expressed in *Griggs v. Provident Consumer Discount Co.*, 459 U.S. at 58, that the jurisdictional authority of district courts and courts of appeal are mutually exclusive regarding issues raised in the appeal, *see generally* CHARLES ALAN WRIGHT, ARTHUR R.

MILLER, & EDWARD H. COOPER, 16A FEDERAL PRACTICE & PROCEDURE JURISDICTION §§ 3949.1, 3987 (3d ed. 1999 and 2005 Pocket Part), such as avoiding confusion or a waste of time by having the same matter considered in more than one forum at the same time, *see DeFries*, 129 F.3d at 1303; *United States v. Salerno*, 868 F.2d 524, 540 (2d Cir. 1989), apply to administrative proceedings, *cf. United Transp. Union*, 871 F.2d at 1117. However, the Chamber overlooks the fact that administrative agencies, unlike federal courts, are not jurisdictionally constrained by the case-and-controversy limitation in Article III. *See* U.S. CONST. art. III; *Envirocare of Utah, Inc. v. NRC*, 194 F.3d 72, 74 (D.C. Cir. 1999); *see also Fund Democracy, LLC v. SEC*, 278 F.3d 21, 27 (D.C. Cir. 2002). Thus, the Chamber must recognize that its analogy based on Rule 41 is not informed by the concerns underlying Article III. It observes that in *DeFries* this court stated that the principle that a district court lacks jurisdiction to act until the court of appeals' mandate issues is "grounded in solid considerations of efficient judicial administration," 129 F.3d at 1303. Even assuming that Article III concerns do not inform *DeFries'* holding, the Chamber's contention fails.

The court has previously recognized that agencies possess authority to address issues identified by the court prior to the issuance of its mandate. *See, e.g., Hazardous Waste Treatment Council v. EPA*, 886 F.2d 355, 371 (D.C. Cir. 1989); *Nat'l Coal. Against Misuse of Pesticides v. Thomas*, 809 F.2d 875, 884-85 (D.C. Cir. 1987); *Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 855 (D.C. Cir. 1987); *see also Northern States Power Co. v. U.S. Dep't of Energy*, 128 F.3d 754, 761 (D.C. Cir. 1997). The Chamber would distinguish those cases on the ground that in those instances the court instructed the agency to proceed, and thus "wielded its mandate to determine when its action attains controlling force so as to marshal litigation in an orderly manner through the legal system." Petitioner's Br. at 33.

Even if that distinction were persuasive, no such distinction applies to *Alabama Power Co. v. FPC*, 511 F.2d 383 (D.C. Cir. 1974).

In *Alabama Power*, the court observed that although "[l]imitations on the [agency's] power to modify an order during the pendency of an appeal may be inferred from Section 313 of the Federal Power Act, 16 U.S.C. § 825l [(1970)] . . . . [t]he precise scope of these limitations has not been fully defined." 511 F.2d at 388. Section 313 authorized the agency, upon application for rehearing, to set aside or modify an order until the record in the proceeding had been filed in the court of appeals and stated that, upon the filing of a petition for review, the appellate court has exclusive jurisdiction to affirm, modify, or set aside the order. Concluding that it was unnecessary "to define the precise contours of Section 313," the court held that

> [a]ssuming the [agency's] remedial powers [are] limited during the pendency of appeal, it nevertheless retains power to consider a petition for amendment and to defer until disposition of the appeal any modification found appropriate or, in a case of urgency, to apply to the reviewing court for a remand order so as to permit amendment.

*Id*. The court cited *Smith v. Pollin*, 194 F.2d 349 (D.C. Cir. 1952), which established an exception under Rule 41 for district courts to reconsider an order or judgment pending on appeal and to seek remand of the case if it decided to grant relief, *id*. at 350. By parity of reasoning, the court in *Alabama Power* held that the Federal Power Commission retained jurisdiction to consider whether it would revise the Rule prior to the issuance of the court's mandate. 511 F.2d at 388.

*Alabama Power* is dispositive here because the

jurisdictional provisions of section 43(a) of the ICA, 15 U.S.C. § 80a-42(a),[1] are substantially the same as section 313 of the Federal Power Act, 16 U.S.C. § 825l, as construed in *Alabama Power*. Assuming, as in *Alabama Power*, that the statute limited

---

[1] Section 43(a) of ICA provides:

> Any person or party aggrieved by an order issued by the Commission . . . may obtain a review of such order in the United States court of appeals within any circuit wherein such person resides or has his principal place of business, or in the United States Court of Appeals for the District of Columbia . . . . Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record shall be exclusive, to affirm, modify, or set aside such order, in whole or in part.

15 U.S.C. § 80a-42(a). It further provides for a modified remand procedure for further findings of fact:

> If application is made to the court for leave to adduce additional evidence, and it is shown to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceeding before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order.

the Commission's remedial power prior to the issuance of the mandate in *Chamber I*, the Commission was not disabled from *sua sponte* considering whether to modify the Rule's two conditions. *See* ICA § 6(c), 15 U.S.C. § 80a-6(c). Because the Commission decided not to modify the Rule, there is no need to consider whether, prior to issuance of the mandate, the Commission retained authority to adopt amendments to the Rule without first seeking a remand of the proceeding. While there was a small risk that the Commission's response would have become wasted effort had the court granted the Chamber's petition for rehearing in *Chamber I*, this risk is balanced against the benefits of allowing an agency broad scope to carry out its mission, *cf. Alabama Power*, 511 F.2d at 388-89, particularly as the goal of conserving judicial resources is served under the *Smith v. Pollin* approach adopted in *Alabama Power*.

Accordingly, we hold that the Chamber has standing under Article III to bring its petition challenging the Rule's two conditions and that the Commission had authority to consider whether to alter the conditions in response to *Chamber I* prior to the issuance of the mandate.

## III.

Section 553 of the APA requires that an agency give notice of a proposed rule setting forth "either the terms or substance of the proposed rule or a description of the subjects and issues involved," 5 U.S.C. § 553(b), and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation," *id.* § 553(c). Among the information that must be revealed for public evaluation are the "technical studies and data" upon which the agency relies. *See Solite Corp. v. EPA*, 952 F.2d 473, 484 (D.C. Cir. 1991).

Congress may vest broad rulemaking authority in an agency, and even charge the agency with "swiftly and effectively implementing [a] national policy," *Natural Res. Def. Council, Inc. v. SEC*, 606 F.2d 1031, 1050 (D.C. Cir. 1979) ("*NRDC*"), but on remand the agency remains bound by the APA's notice and comment requirements, *see Simmons v. ICC*, 757 F.2d 296, 300 (D.C. Cir. 1985); *cf. West Virginia v. EPA*, 362 F.3d 861, 869 (D.C. Cir. 2004). Although judicial review of informal rulemaking is generally limited in scope, *see NRDC*, 606 F.2d at 1050, and is deferential when rulemaking implicates the agency's expertise, *see Fresno Mobile Radio, Inc. v. FCC*, 165 F.3d 965, 971 (D.C. Cir. 1999), more exacting review may be required when the presumption of regularity is rebutted, as may occur when the agency arrives at an identical result on remand under circumstances that throw into question the regularity of its proceedings, *see NRDC*, 606 F.2d at 1049 n.23; *Food Mktg. Inst. v. ICC*, 587 F.2d 1285, 1289-90 (D.C. Cir. 1978); *see also Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971). Reviewing the procedures through which agencies develop legislative rules falls within the court's "special area[s] of competence" and generally "contributes to the rationality and fairness of agency decisionmaking without detracting unduly from its effectiveness." *NRDC*, 606 F.2d at 1049; *see Envtl. Def. Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 598 (D.C. Cir. 1971).

Where the court does not require additional fact gathering on remand, as in *Chamber I*, 412 F.3d at 145, the agency is typically authorized to determine, in its discretion, whether such fact gathering is needed, *see Sierra Club v. EPA*, 325 F.3d 374, 382 (D.C. Cir. 2003) (citing *Nat'l Grain & Feed Ass'n v. OSHA*, 903 F.2d 308, 310-11 (5th Cir. 1990)), and how it should be accomplished, *see NRDC*, 606 F.2d at 1055. If the agency determines that additional fact gathering is necessary, then notice and comment are typically required. *See Action on*

*Smoking and Health v. Civil Aeronautics Bd.*, 713 F.2d 795, 799-800 (D.C. Cir. 1983); *cf. Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 7 (D.C. Cir. 1999); *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 745 F.2d 677, 684-85 (D.C. Cir. 1984).

However, further notice and comment are not required when additional fact gathering merely supplements information in the rulemaking record by checking or confirming prior assessments without changing methodology, *see Solite,* 952 F.2d at 485, by confirming or corroborating data in the rulemaking record, *see Community Nutrition Inst. v. Block*, 749 F.2d 50, 57–58 (D.C. Cir. 1984); *cf. Building Indus. Ass'n of Superior Cal. v. Norton*, 247 F.3d 1241, 1246 (D.C. Cir. 2001), or by internally generating information using a methodology disclosed in the rulemaking record, *Air Transp. Ass'n of Am. v. Civil Aeronautics Bd.*, 732 F.2d 219, 224 (D.C. Cir. 1984); *cf. Portland Cement Ass'n v. Ruckleshaus,* 486 F.2d 375, 393 (D.C. Cir. 1973). For example, in *Solite*, the agency's explanation of a rule rested on a survey, which was not part of the rulemaking record, that the agency substituted for an older report in the rulemaking record. *Solite*, 952 F.2d at 481. The court stated that "consistent with the APA, an agency may use 'supplementary' data, unavailable during the notice and comment period, that 'expands on and confirms' information contained in the proposed rulemaking and addresses 'alleged deficiencies' in the pre-existing data, so long as no prejudice is shown." *Id.* at 484 (quoting *Community Nutrition*, 748 F.2d at 57-58) (alterations omitted). Such "supplementary" information, the court explained in *Community Nutrition,* is distinct from "provid[ing] entirely new information critical to the [agency]'s determination." *Community Nutrition*, 749 F.2d at 57–58 (citations omitted). When the agency relies on supplementary evidence without a showing of prejudice by an interested party, *see Solite*, 952 F.2d at 484; *Community*

*Nutrition*, 748 F.2d at 58, the procedural requirements of the APA are satisfied without further opportunity for comment, provided that the agency's response constitutes a "logical outgrowth" of the rule initially proposed, *see Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005); *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 952 (D.C. Cir. 2004).

In essence, the question is whether "at least the most critical factual material that is used to support the agency's position on review . . . [has] been made public in the proceeding and exposed to refutation." *Ass'n of Data Processing*, 745 F.2d at 684; *see Air Transp. Ass'n*, 169 F.3d at 7. By requiring the "most critical factual material" used by the agency be subjected to informed comment, the APA provides a procedural device to ensure that agency regulations are tested through exposure to public comment, to afford affected parties an opportunity to present comment and evidence to support their positions, and thereby to enhance the quality of judicial review. *See Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005). These considerations are no less relevant when an agency on remand considers whether to modify a rule pending on appeal. *See Simmons*, 757 F.2d at 300.

The Commission maintains that section 553 did not require further notice and comment in response to *Chamber I* for two reasons: First, the Rule's two conditions were set out in materially the same terms in the notice of proposed rulemaking, *see* Investment Company Governance, Release No. 26,323, 69 Fed. Reg. 3472, 3473 (Jan. 23, 2004) ("NOPR"), thus providing all interested parties the opportunity to comment on the proposed amendments and specifically on their costs, *see id.* at 3481. Second, although the Commission relied on materials not made subject to public comment under section 553(c), the

materials were "publicly available" and merely supplemented data in the rulemaking record that had been subject to public comment. *See* Response Release, 70 Fed. Reg. at 39,391. We agree with the Commission's first point, because the NOPR provided adequate notice, but not the second, because the extra-record materials did not merely supplement the rulemaking record without prejudice to the Chamber, and the public availability of those materials, in this instance, does not merit an exception to the comment requirement of section 553(c). We therefore do not reach the Chamber's contention that the Commission's decision to forgo further notice and comment and rely on extra-record materials was arbitrary and capricious under the APA. *Cf. Air Transp. Ass'n*, 169 F.3d at 8.

In *Chamber I*, the court held that the Commission, in order to satisfy "its statutory obligation" under ICA § 2(c), 15 U.S.C. § 80a-2(c), would need "to do what it can to apprise itself — and hence the public and the Congress — of the economic consequences of a proposed regulation before it decides whether to adopt the measure." *Chamber I*, 412 F.3d at 144. Given this general instruction, the Commission was not required under section 553(b) to give further notice of the two conditions. The NOPR identified the amendments to the Exemptive Rules, proposed the 75% independent director and independent chair conditions, *id.*, and solicited comments and empirical data on costs. *See* NOPR, 69 Fed. Reg. at 3473. In relevant part, the NOPR stated:

> We do not anticipate that these proposals will have a significant effect on efficiency, competition and capital formation with regard to funds because the costs associated with the proposals are minimal and many funds have already adopted some of the proposed practices. . . . We request comments on whether the proposed rule amendments, if adopted,

would promote efficiency, competition, and capital formation. Will the proposed amendments or their resulting costs materially affect the efficiency, competition, and capital formation of funds? Comments will be considered by the Commission in satisfying its responsibilities under section 2(c) of the Investment Company Act. Commenters are requested to provide empirical data and other factual support for their views to the extent possible.

*Id.* The NOPR thus fully informed interested parties of the two conditions and expressly requested comments on costs so that the Commission would be in a position to comply with ICA section 2(c). *See Envtl. Integrity Project*, 425 F.3d at 996.

The Commission's extensive reliance upon extra-record materials in arriving at its cost estimates, and thus in determining not to modify the two conditions, however, required further opportunity for comment under section 553(c). The Commission justified its decision not to reopen the comment period on the ground that "the information in the existing record, *together with publicly available information upon which we may rely*, is a sufficient base on which to rest the Commission's consideration of the deficiencies identified by the Court." Response Release, 70 Fed. Reg. at 39,391 (emphasis added); *see also id.* at 39,392 n.24. To the extent the Commission suggests that the "publicly available" extra-record materials merely supplemented the rulemaking record, which alone would have been sufficient to allow the Commission to estimate the costs of the two conditions, it ignores what is obvious from the Response Release.

To develop cost estimates for the Rule's two conditions, the Commission relied on privately produced "Management Practice Inc. Bulletin[s]," *id.* at 39,392 nn. 24, 28, 30; *id.* at

39,393 nn. 33, 43; *id.* at 39,394 n.48; *id.* at 39,395 n.73, and a nonpublic survey of compensation and governance practices in the mutual fund industry that is summarized in one of these bulletins, *id.* at 39,392 n.28. Neither the bulletins nor the survey were part of the rulemaking record. Nor did the Commission identify the bulletins as materials on which it typically relies in rulemakings. *Compare id.* at 39,394. Yet these extra-record materials supply the basic assumptions used by the Commission to establish the range of costs that mutual funds are likely to bear in complying with the two conditions. *See id.* at 39,392. The bulletins constitute the only source of information on the number of directors serving on the boards of most mutual funds, *id.* n.24, the median annual salaries for directors, *id.* n.28 (summarizing the "widely used" survey), and the rough breakdown between boards overseeing a large number of individual funds and boards overseeing a small number of funds, *id.* n.30. With these three assumptions — average number of board members, average salary, and average number of funds overseen by an individual director — the Commission was able to "estimate the annual compensation cost *per fund*" of the 75% independent director requirement from $4,779 for large fund complexes to $37,500 for boards overseeing only one fund. *Id.* at 39,392-93.

When the Commission does refer to information in the rulemaking record with regard to the per fund cost calculation for the 75% independent director condition, *see id.* at 39,393 n.31, the Commission uses this data to bolster estimates based upon the extra-record materials, and not the other way around. Specifically, the Commission, in referring to two letters in the rulemaking record, "note[s] that commentators' estimated costs of paying new independent directors ranged from $4000 to $20,000, which are roughly comparable with and do not exceed our estimated ranges." *Id.* (citing letters of New Alternatives Fund, Inc. (Feb. 9, 2004) and Independent Directors of Flaherty

& Crumrine Preferred Income Opportunity Fund Inc. (Feb. 23, 2004)).  But comparing the range derived from the record data with the range derived from the extra-record data implies that the two ranges are comparable.  The ranges are not comparable because the two letters, which are cited as the source of the $4,000 and $20,000 figures, refer only to boards overseeing "small" and "small to mid-sized funds."

Hence, the $4,000 to $20,000 range derived from the rulemaking record is comparable only to the $37,500 figure that the Commission estimated as the per fund cost for boards overseeing a single fund.  This comparison of the $37,500 estimate and the $4,000 to $20,000 range suggests that the Commission, acting conservatively, may have overestimated the per fund cost for boards overseeing only a few funds.  *See* Response Release, 70 Fed. Reg. at 39,392.  However, the Commission points to no data in the rulemaking record to support its per fund cost estimate for compensation of independent directors overseeing a large number of funds.  At best, the rulemaking record supports only one end of the Commission's estimated range; the cost estimate for boards overseeing a large number of funds appears entirely derived from the extra-record materials.  *See id.* 39,392 n.28.  The rulemaking record, then, serves to supplement the extra-record data by providing a cross-check for only the Commission's estimate for small fund families.

Other aspects of the Commission's decision illustrate that it treated extra-record data as primary, rather than supplementary, evidence. Extra-record sources are essential to the Commission's cost estimate for the independent chair condition, which is based on estimates of the cost of compensation for independent directors.  *See id.* at 39,395.  With respect to the ancillary, non-compensation costs of the conditions, while the nature of the Commission's estimates is

somewhat different — because they are largely based upon such things as the prevailing rates for legal, financial, and other services, matters with which Commission Members are likely to be familiar and which are less susceptible to reasonable disagreement — extra-record data is similarly essential to these estimations to the extent they are affected by the Commission's predictions about how funds would come into compliance and how independent directors will behave. *See, e.g., id.* at 39,394. Thus, even with respect to ancillary costs, section 553(c) required that interested parties have the opportunity to comment prior to the agency's final decision.

On appeal, the Commission maintains, relying on *Solite*, 952 F.2d at 484, and *Building Industry*, 247 F.3d at 1246, that the extra-record materials simply filled gaps in the rulemaking record and "only confirmed the findings delineated in the [NOPR]." Respondent's Br. at 46. By this, the Commission suggests that the extra-record materials were "supplementary" — not in the sense of being unnecessary support for the Commission's cost estimates — but in the sense of filling the gap left in the rulemaking record after the Commission had solicited public comment on the costs of the proposed amendments. The NOPR requested such cost data and stated that the Commission expected "the costs associated with the proposals to be minimal." 69 Fed. Reg. at 3473. However, neither *Solite*, 952 F.2d at 484, nor *Building Industry*, 247 F.3d at 1246, suggest that an agency generally may rely, without affording comment, on data critical to support a rule solely because the existing record contains a deficiency that extra-record data might cure.

Rather, for extra-record data to be "supplementary," it must clarify, expand, or amend other data that has been offered for comment. *See Air Transp. Ass'n*, 169 F.3d at 8. In *Solite*, the agency relied upon an updated and expanded extra-record study

that was based upon a "methodology . . . that did not change significantly from the proposed notices," giving the petitioners "ample opportunity to criticize the [agency's] approach." *See* 952 F.2d at 485. In *Building Industry*, the agency relied upon a comprehensive empirical study that "confirmed the findings delineated in the proposal," was supported by data in the record, and "provided *additional* support for that hypothesis." *See* 247 F.3d at 1246 (emphasis added). Similarly, the Commission's reliance on the statement in *Association of Data Processing* "that the 'administrative record' might well include crucial material that was neither shown to nor known by the private parties in the proceeding," 745 F.2d at 684, is misplaced, for the court was addressing judicial review of all informal agency actions, including adjudications under the arbitrary and capricious standard, 5 U.S.C. § 706, not addressing an agency's independent requirement to provide notice and comment under section 553(c). *See Ass'n of Data Processing*, 745 F.2d at 683-84.

The Commission also maintains that it was free to use extra-record data in its response because the Chamber has not, as we have required, shown that it was prejudiced by its lack of opportunity to comment. *See Solite*, 952 F.2d at 484 (citing *Community Nutrition*, 749 F.2d at 57-58, and *Air Transp. Ass'n*, 732 F.2d at 224); *see also Air Canada v. Dep't of Transp.*, 148 F.3d 1142, 1156-57 (D.C. Cir. 1998) (citing 5 U.S.C. § 706). To show prejudice, those protesting the use of supplementary information might "point to inaccuracies in the [supplemental] data," *Solite,* 952 F.2d at 484, show that the agency "hid or disguised the information it used, or otherwise conducted the rulemaking in bad faith," *id.,* or "indicate with 'reasonable specificity' what portions of the [data] it objects to and how it might have responded if given the opportunity," *Air Transp. Ass'n*, 169 F.3d at 8. The court has not required a particularly robust showing of prejudice in notice-and-comment cases,

holding that "an utter failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure." *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002) (explaining the standard of *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1324 (D.C. Cir.1988)); *see also Sprint Corp. v. FCC*, 315 F.3d 369, 376-77 (D.C. Cir. 2003). Although the instant case does not involve the outright dodge of APA procedures that led the court to permit a limited showing of prejudice, *see McLouth Steel Prods. Corp.*, 838 F.2d at 1323-24, the Chamber has offered objections and studies creating enough "[un]certainty whether petitioner's comments would have had some effect if they had been considered," *id.* at 1324, to show prejudice.

To be clear, the requirement, deriving from sections 553(c) and 706 that an agency may rely on supplemental materials to fill gaps in the rulemaking record only when there is no prejudice to the interested parties does not mean parties can withhold relevant data and blindside the agency on appeal. When, after an agency explains the basis for its preliminary conclusions by reference to the information on which it has relied and requests data regarding its conclusions, and the agency concludes no such data (or no data the agency concludes is reliable) has been produced during the comment period, the agency may develop data along the lines it has proposed to fulfill its statutory obligations without further public comment. *See Solite*, 952 F. 2d at 484-85. In light of the notice provided, there is no fair-comment prejudice to interested parties under section 553(c) even if the extra-record materials serve as the crucial confirmation of the agency's preliminary conclusions, *see Building Indus.*, 247 F.3d at 1246, or even as the compelling reason for the agency's modification of its preliminary conclusion, *see Solite* 952 F.2d at 484-85. A contrary rule would provide a perverse incentive for parties

opposing a rule to withhold data in order to seek vacation of the rule on appeal.

This is not the situation here. The Commission's bare request for information on costs and its expectation that these costs would be "minimal" did not place interested parties on notice that, in the absence of receiving reliable cost data during the comment period, the Commission would base its cost estimates on an extra-record summary of extra-record survey data that, although characterized as "a widely used survey," was not the sort, apparently, relied upon by the Commission during the normal course of its official business. For purposes of section 553(c), it is one thing to suggest that members of the mutual fund industry are familiar with an extra-record survey and quite another thing to give notice that the Commission would rely on a summary of that survey as set forth in the bulletins. The Chamber's failure to critique the extra-record bulletins and summarized survey until this appeal indicates that it had no reason to anticipate the Commission's ultimate reliance on those materials.

Moreover, the rulemaking record closed almost a year before the Commission returned to the cost issue in July 2005, and during that period more funds had adopted the Rule's conditions. *See* Response Release, 70 Fed. Reg. at 39,391, 39,398; *see id.* at 39,407 & n.23 (Atkins, Comm'r, dissenting). When the Commission decided not to reopen the rulemaking record, individual mutual funds had offered to provide information on their actual implementation costs and the Investment Company Institute had offered to gather such data from its membership. *See id.* The Chamber alerted the Commission that the actual implementation data would identify how funds had adopted the 75% independent director condition and could indicate whether independent director's fees had increased and whether additional staff had been hired in light of

the added costs for the fund.

The Commission would rebut the Chamber's assertions of prejudice by pointing out that the Chamber has not suggested the implementation cost data would show that the Commission's cost estimates are materially inaccurate. This is not the relevant test of prejudice under our precedent, which does not require a showing that the Commission would have reached a different result. *See, e.g., Sprint*, 315 F.3d at 376-77. While the Chamber's section 553(c) challenge focuses on the procedural faults of the Commission's action, with respect to which the Chamber maintains it had no burden to show such prejudice because it had no knowledge of the specific extra-record information until the Commission relied upon such information in its final decision, *see Air Transp. Ass'n*, 169 F.3d at 8, the Chamber proffered specific and credible objections to the soundness of the Commission's estimates and hence to its decision not to modify the two conditions. *See id.*; *Sprint*, 315 F.3d at 377. Specifically, the Chamber maintains that the Commission's cost estimates were predicated upon an assumption that the extra-record survey summarized in an extra-record bulletin provides information on the salaries solely of *independent* directors, *see* Response Release, 70 Fed. Reg. at 39,392 n.28, which if incorrect "would have depressed the overall salary data and potentially seriously undermined this important cost of the rule," Petitioner's Br. at 46. *Cf. Cent. & S. Motor Freight Tariff Ass'n v. ICC*, 777 F.2d 722, 737 (D.C. Cir. 1985). Although the Chamber also identifies data regarding small funds that it would have presented had it been afforded an opportunity to comment, only data that was unavailable during the comment period is relevant here as the NOPR specifically requested cost data; the actual implementation data, however, would either lend support or not to the Chamber's position that the Commission understated the potential ill effects of the two conditions on smaller mutual

funds. *Cf. Air Transp. Ass'n*, 169 F.3d at 8. Under our precedents, the Chamber need not prove that its comments would have persuaded the Commission to reach a different outcome. The Chamber's demonstration that it had something useful to say about this critical data is sufficient to establish prejudice.

In sum, the combination of circumstances — inadequate notice that the Commission would base its cost estimates for the two conditions on "publicly available" extra-record materials on which it did not typically rely in rulemakings; the Commission's acknowledgment that the rulemaking record contained gaps and did not include reliable cost data; the availability of additional implementation data for the period between the close of the rulemaking record and the Commission's response to *Chamber I* as more funds adopted the conditions; the Chamber's colorable claim that the Commission's failure to consider such implementation data harms its investment choices — suffices to show that the Chamber has been prejudiced by the Commission's reliance on materials not in, nor merely "supplementary" to, the rulemaking record. *See Solite*, 952 F.2d at 484; *Community Nutrition*, 748 F.2d at 57-58.

The Commission seeks to mitigate its procedural burdens in two ways. First, the Commission suggests that public comment was not necessary because the extra-record materials on which it relied were "publicly available." *See* Response Release, 70 Fed. Reg. at 39,391. In some instances, "publicly available" information, such as "published literature in the fields relevant to the [agency's] proposal," may be so obviously relevant that requiring it be specifically noticed and included in the rulemaking record would advance none of the goals of the APA, *see* RICHARD J. PIERCE, ADMINISTRATIVE LAW TREATISE § 7.3, at 436-38 (2004), such as improving the quality of the

information used by the agency, ensuring fairness to affected parties, or enhancing the quality of judicial review, *cf. Sprint*, 315 F.3d at 373. The public availability of such information might fall into an implied exception to the general requirement that extra-record data critical to support a legislative rule be subject to public comment, *see Community Nutrition*, 749 F.2d at 57-58, or, alternatively, go towards negating the petitioner's claims of prejudice when such extra-record information is used to cure deficiencies in the rulemaking record. Neither circumstance is present here.

On appeal, the Commission characterizes the extra-record survey as a "widely used industry survey," Response Release, 70 Fed. Reg. at 39,392 n.28; Respondent's Br. at 52, noting that an earlier version had been cited by the dissenting commissioners, *id.*, and pointing to the Management Practice Inc. website as one public source for the bulletins summarizing the results of this survey. However, the mere availability of the extra-record bulletins on the internet is insufficient to demonstrate that these bulletins are generally considered reliable sources of information that should be treated as the inevitable background source of information on the mutual fund industry, as might be true, in other contexts, of a relevant study in a broadly cited scientific journal. *See* PIERCE, ADMINISTRATIVE LAW TREATISE § 7.3, at 436-38. Although the Commission points out that opponents of the two conditions, including the Investment Company Institute, have cited a broad array of publications as the principal sources on fund director compensation during the last decade, this does not explain why these particular privately produced bulletins are trustworthy or confirm that the survey is so reliable or ubiquitous that the procedural requirements for comment should be relaxed when these materials serve as the critical data on which the Commission relies to assess the costs of implementing the two conditions. *See Building Indus.*, 247 F.3d at 1245-46; *Ass'n of*

*Data Processing*, 745 F.2d at 684-85; *see also Int'l Union, UAW v. OSHA*, 938 F.2d 1310, 1324 (D.C. Cir. 1991) (citing *Sierra Club v. Costle*, 657 F.2d 298, 398 (D.C. Cir. 1981)). Unlike the salary surveys conducted by the Securities Industry Association, which the Commission identified as "a source on which we commonly rely in our rulemakings," Response Release, 70 Fed. Reg. at 39,394, and the Mutual Fund Fact Book, which is a generally cited source of statistical information relied upon by the Commission in other rulemakings, *see, e.g.*, Regulation NMS, Exchange Act Release No. 34-51808, 70 Fed. Reg. 37,496, 37,532 n.300 (2005), the bulletins received no such commendation by the Commission in the Response Release.

Nor are the Chamber's claims of prejudice materially diminished because the bulletins are "publicly available." The NOPR did not indicate that the Commission intended to rely on these bulletins if reliable cost data was not produced during the comment period, much less indicate that the Commission considered the bulletins to be a source of reliable data for estimating the costs of the two conditions. The fact that the dissenting Commissioners cited a news article that summarized an extra-record survey conducted by the publisher of the bulletins, *see* Adopting Release, 69 Fed. Reg. at 46,391 n.24 (Glassman & Atkins, Comm'rs, dissenting), likewise does not indicate that interested parties would have treated a summary of the "widely used survey" as background information or focused their comments on the survey. At best, notice was given that surveys of the type typically relied upon by the Commission in rulemakings should be addressed. In fact, one of the bulletins was not in existence until after the rulemaking record had closed and thus was not "publicly available" for comment. *See id.* at 39,393 n.43.

Nor does public access to the bulletins alter the fact that the

Commission had acknowledged the inadequacies of the rulemaking record with respect to estimating costs. The Commission's recourse to extra-record materials indicates that even for the more refined task of estimating direct costs described in *Chamber I*, 412 F.3d at 144, the Commission continued to view the rulemaking record as lacking reliable cost information. Nor, finally, does the availability of the "widely used survey" alleviate the prejudice to the Chamber when the Commission, in light of its prior acknowledgment of the inadequacies of the rulemaking record and the period during which more funds had adopted the conditions, declines to reopen the record to allow the Chamber to submit actual implementation cost data. Although the Commission's judgment in relying on these extra-record sources may be well-founded, the bulletins themselves acknowledge "wide divergence" among the funds represented in the summarized extra-record survey "in the methodologies used to calculate director compensation." Management Practice Inc. Bulletin: More Meetings Means More Pay for Fund Directors at 1 (April 2004) (cited at 70 Fed. Reg. at 39,392 n.28). In the absence of an explanation by the Commission, this caveat suggests that other, possibly more reliable estimates may exist that could have influenced the Commission's assumptions about director compensation, which supports the Chamber's claim of prejudice.

Second, the Commission justifies its choice to act without re-opening the record by invoking the need to act swiftly:

> We find that any further delay or ambiguity surrounding implementation of the rules would disadvantage not only investors but also fund boards and management companies, most of which have already begun the process of coming into compliance with the rules. By acting swiftly and deliberately to

> respond to the Court's remand order, the Commission will reduce uncertainty, facilitate better decision-making by funds, and ultimately serve the interests of fund shareholders.

*Id.* at 39,398. The Commission's preference to proceed with the same five Commission Members who were familiar with the rulemaking in considering the cost estimates described in *Chamber I*, *see id.* at 39,391, is not the type of exigent circumstance that comes within the narrow "good cause" exception of section 553(b)(B). *See Tennessee Gas Pipeline Co. v. FERC*, 969 F.2d 1141, 1144 (D.C. Cir. 1992); *Util. Solid Waste Activities Group v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001). The exception excuses notice and comment in emergency situations, *Am. Fed'n of Gov't Employees v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981), where delay could result in serious harm, *see Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004) (citing *Hawaii Helicopter Operators Ass'n v. FAA*, 51 F.3d 212, 214 (9th Cir. 1995)), or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare, *see Mobil Oil Corp. v. Dep't of Energy*, 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983). These exigent circumstances are of a far different nature than the not uncommon circumstance facing commissions when their membership changes during the course of a rulemaking, which may involve appeals and remands and thus extend for a period of years. Although the Commission's membership would change after June 30, 2005, and the even division among the remaining Commissioners could delay further action on the Rule, which the Commission considered necessary to redress "a serious breakdown in management controls," Adopting Release, 69 Fed. Reg. at 43,379, the risk of such delay is hardly atypical and does not satisfy the narrow exception.

Therefore, because the Commission relied on extra-record material critical to its costs estimates without affording an opportunity for comment to the prejudice of the Chamber, we hold that the Commission violated the comment requirement of section 553(c).

## IV.

The question remains what is the appropriate remedy for the Commission's procedural violation under section 553(c). The APA provides that the court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law," 5 U.S.C. § 706(2)(D), with "due account . . . taken of the rule of prejudicial error," *id*. § 706. Under circuit precedent, the decision to remand or vacate hinges upon court's assessment of "the seriousness of the . . . deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (citations omitted).

When the Rule was proposed, the Commission estimated that nearly 60% of mutual funds already complied with the 75% independent director condition. *See* Response Release, 70 Fed. Reg. at 39,391 & n.18. The court stayed the effectiveness of the Rule's two conditions on August 10, 2005; the other amendments to the Exemptive Rules, *see* Adopting Release, 69 Fed. Reg. at 46,381, were scheduled to take effect on January 15, 2006. *See* 17 C.F.R. § 270.0-1(a)(7)(v), (vi), & (vii) (2005). In the meantime, more mutual funds have voluntarily adopted the challenged conditions. *See* Response Release, 70 Fed. Reg at 39,407 (Atkins, Comm'r, dissenting). In other words, the two conditions, which were part of a larger program of regulatory reforms adopted by the Commission to address serious conflicts

of interest in the mutual fund industry by changing the "boardroom culture," Response Release, 70 Fed. Reg. at 39,397, have become partially operational.

The Commission's reliance on extra-record materials to fulfill its statutory obligation under ICA § 2(c), 15 U.S.C. § 80a-2(c), effectively acknowledges gaps in the rulemaking record that could not be properly supplemented without further opportunity for comment under section 553(c). Given the circumstances described in Part III of this opinion, a further remand to the Commission without the opportunity for comment would be unproductive. This suggests that vacation of the 75% independent director and independent chair conditions would be appropriate.

However, although vacating the two conditions would be less disruptive than if they had taken effect on January 15, 2006, *see Allied Signal*, 988 F.2d at 150-51, a significant portion of the mutual fund industry appears to have come into substantial compliance with the Rule. This compliance tends to suggest that immediate vacation of the two conditions risks substantial disruption to the mutual fund industry because of the resultant inconsistent governance practices that would arise within the industry, which also might sow confusion in the investing public. Also, the Commission's decision to rely upon extra-record data without reopening the rulemaking record for comment does not, of itself, indicate that the Commission's cost estimates are incorrect, much less that its conclusion, under ICA § 2(c), that the costs of implementing the two conditions do not outweigh the benefits of adopting the two conditions. *See id.*

The Commission is in a better position than the court to assess the disruptive effect of vacating the Rule's two conditions. Therefore, the court will vacate the 75% independent director and independent chair conditions of the

Rule but, given the court's expectation in *Chamber I* that the Commission could "readily" address costs, 412 F.3d at 144, withhold the issuance of its mandate pursuant to Rule 41(b) for ninety days. Such an approach is not unprecedented. *See Hazardous Waste Treatment Council*, 886 F.2d at 371; *Nat'l Coal. Against Misuse of Pesticides*, 809 F.2d at 884-85; *Indep. U.S. Tanker Owners Comm.*, 809 F.2d at 855; *Simmons*, 757 F.2d at 300; *see also Rodway v. U.S. Dep't of Agric.*, 514 F.2d at 817-18. This approach will afford the Commission an opportunity to reopen the record for comment on the costs of implementing the two conditions. Within ninety days the Commission shall file a status report with the court, unless the Commission shall have prevailed on a motion to modify, accelerate, or postpone the mandate, and upon further order the mandate will issue.

Accordingly, we grant the Chamber's petition, without reaching its other challenges to the Remand Release, vacate the two conditions, but withhold the issuance of the mandate for ninety days as set forth in this opinion.